UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

MICHELLE L. FRAZIER,                    )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )       CIVIL NO.  3:14cv385
                                        )
CAROLYN W. COLVIN, Acting               )
Commissioner of Social Security,        )
                                        )
        Defendant.                      )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant

Commissioner of Social Security Administration denying Plaintiff's application for Disability

Insurance Benefits and Supplemental Security Income  as provided for in the Social Security Act.

42 U.S.C. § 401 *et seq*.  Section 205(g) of the Act provides, <u>inter alia</u>, "[a]s part of his answer,

the [Commissioner] shall file a certified copy of the transcript of the record including the

evidence upon which the findings and decision complained of are based.  The court shall have

the power to enter, upon the pleadings and transcript of the record, a judgment affirming,

modifying, or reversing the decision of the [Commissioner], with or without remanding the case

for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if

supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g). The law

provides that an applicant for disability insurance benefits must establish an "inability to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to last for a continuous period of not less than 12 months. . .

."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.      The claimant has not engaged in substantial gainful activity since February 9, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.	The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, Morton's neuroma, and cubital tunnel syndrome, status post-surgery (20 CFR 404.1520(c) and 416.920(c)).

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.	After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant can lift and carry twenty pounds occasionally and ten pounds frequently. The claimant can sit for six hours and stand and/or walk for four hours for a total of eight hours in a workday, with normal breaks. The claimant can occasionally climb stairs and ramps, but cannot climb ladders, ropes, and scaffolds. The claimant needs to alternate between sitting and standing every thirty minutes. The claimant can occasionally balance, stoop, kneel, crouch and crawl. The claimant can engage in frequent, but not constant, reaching, handling, and fingering with her dominant right upper extremity.

6.	The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.	The claimant was born on January 18, 1971 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.	The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.	Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404,Subpart P, Appendix 2).

10.	Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

(Tr. 54-61).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on July 14, 2014. On October 20, 2014, the defendant filed a memorandum in support of the Commissioner's decision, and on November 7, 2014, Plaintiff filed her reply. Upon full review of the record in this cause, this court is of the view that the ALJ's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff filed a claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) alleging the onset date of her disability as of February 9, 2011. (Tr. 52) She was

denied on initial consideration and reconsideration. (Tr. 68-75 and 78-82) After a timely request for hearing, a hearing was held before the Honorable William E. Sampson (ALJ). (Tr. 8-44) Plaintiff appeared and testified on her behalf. (Id.) Jeffrey Lucas, a Vocational Expert (VE), also testified. (Id.) Plaintiff was represented by attorney, Anne B. Morgan. (Id.) After the hearing, an unfavorable decision was issued. (Tr. 49-67) A timely Request for Review was filed and the Appeals Council denied review on January 8, 2014, making the decision of the ALJ the final determination of the Commissioner. (TR. 1-6)

Plaintiff was forty (40) years old on the date of onset, having been born on January 18, 1971. (Tr. 71) Plaintiff graduated from high school. (Tr. 61) Her past work includes work as a pipe cutter, quality control in an RV production plant and a hairstylist. (Tr. 39) Plaintiff alleges the following severe impairments: Lumbar radiculopathy post lumbar laminectomy at L4-L5, with chronic pain, bilateral Morton's neuroma, anxiety and epicondylitis in right arm. (Tr. 12)

The medical evidence shows that Plaintiff visited Dr. Todd Graham, M.D. on December 20, 2009 and was given a lumbar epidural steroid for low back pain at L5-L5. (Tr. 281-82)

Plaintiff was also treated by Dr. Henry DeLeeuw, M.D. At Plaintiff's appointment in November 2009, she was complaining of low back pain at a level of 10/10 which radiated down into her left leg and calf area. (Tr. 295) Her strength was normal and straight leg raising was negative. (Id.) The impression was a herniated disc at L3-4 and degenerative disc disease from L2 through S1. (Id.) Dr. DeLeeuw suggested trying another course of epidural steroid injections. (Id.) At her follow up in January 2010, her pain was about the same. (Tr. 293) She had an antalgic gait and straight leg raise test was positive on the left. (Tr. 294) An MRI was taken in January 2010,

which showed the post-operative changes at L4-L5 with no recurrent herniation; however, the MRI did show a mass effect in the left lateral recess and the left neural foramen due to facet and ligamentous hypertrophy. (Tr. 298) At Plaintiff's follow up appointment, Dr. DeLeeuw recommended a fusion at L4-L5, L5-S1 for the ongoing leg pain but advised her that the surgery would not relieve her back pain due to the stenosis and degenerative disc disease. (Tr. 291-92) Plaintiff decided that she wanted to have the surgery and Dr. DeLeeuw ordered a discogram to confirm the levels that were problematic. (Tr. 290) At Plaintiff's follow up appointment post discogram in April 2010, Dr. DeLeeuw advised against surgery given the fact she has problems at four concordant levels. (Tr. 286) He suggested her best option would be a spinal cord stimulator as fusing four levels would not be in her best interest. (Id.)

In April 2011, Plaintiff followed up with Dr. DeLeeuw for her back pain. She reported she had been given a trial of a spine stimulator, but the effects were short lived and therefore not successful. (Tr. 408-09) Her pain is regularly a six out of a level of ten. (Id.) She wanted to discuss any restrictions she may have. (Id.) Dr. DeLeeuw told her due to her ongoing pain from the degenerative condition throughout her lumbar spine, she could do a sit down job but must be able to get up and move around for one to two hours. (Id.)

Plaintiff presented to Dr. Kevin Drew for consultation in April 2010. She reported a history of a prior discectomy at L4-5 with increasing severe low back pain with radiation into her left leg. (Tr. 309) She has had injections with no relief and physical therapy with no relief. (Id.) Her pain increases with prolonged sitting, lifting, bending, driving and twisting and is made better with medications and walking. (Id.) She was working full time. (Id.) Exam showed limited

extensions in her back and some discomfort with straight leg raising. (Tr. 310) Dr. Drew diagnosed her with post discectomy syndrome and suspected disc herniation at L4-5 and possibly other levels. (Id.) On April 8, 2010, Dr. Drew performed a discogram which showed internal disc disruption at L2-3, L3-4, L4-5 and L5-S1. (Tr. 307) At those levels the discogram reproduced her complaints of pain confirming the disruption. (Id.) Dr. Drew recommended medication management, either an internal spine stimulator or a four level fusion. (Id.) A CT taken in April 2010 showed multilevel degenerative disc disease with osteophyte ridging, most prominent at the left side of L4-5 with at least moderate left bony neural foraminal narrowing. (Tr. 312) There is also moderate L5-S1 neural foraminal narrowing and multi-level canal stenosis due to bulging and protruding discs from L2 through L5. (Id.)

The spinal stimulator was implanted in July 2010 to attempt to address her ongoing pain. (Tr. 516)

An MRI of her lumbar spine was performed in February 2012 due to increasing low back and left calf pain. (Tr. 410-11) The MRI showed moderate degenerative disc disease L2-L3 through L5-S1. (Id.) Mild to moderate facet arthrosis at multiple levels, mild to moderate spinal canal stenosis at L2-L3 which has worsened since January 2010, moderate central canal stenosis at L3-L4 which has worsened since January 2010. (Id.) There is also prominent eccentric disc bulges to the left at L4-L5 which extends into the inferior recess of the left L4-L5 neural foramen producing moderate narrowing but no significant effacement of the exiting nerve root. (Id.) There is also post-operative granulating tissue/scar tissue in the left lateral epidural space, no new herniation. (Id.)

Plaintiff continued to treat with Dr. Drew for pain management beginning again in January 2012. At that appointment she requested a referral for a second opinion regarding her ongoing back pain. (Tr. 417) Dr. Drew suggested she see Dr. Smith. (Id.)

Dr. Harley Yoder was Plaintiff's primary care physician. She had been treated by him for quite a few years. Back in 2008, although she was still receiving treatment by a pain management specialist, Dr. Todd Graham, she was having increasing pain in her low back. (Tr. 327) She had reproducible low back pain on exam. (Id.) Dr. Yoder also began to treat her for anxiety in 2009. (Tr. 326) In February 2009, Plaintiff was complaining of increased foot pain in her left foot from her Morton's neuroma. (Tr. 325) She had a prior injection by Dr. Biever which was helpful so Dr. Yoder referred her back to Dr. Biever for treatment. (Id.) In April 2009 Plaintiff was also complaining of difficulty concentrating and focusing. (Tr. 324) Although she was tried on Adderall, the side effects were not tolerable. (Id.) Plaintiff also complained of chronic groin pain which was not responding to treatment. (Tr. 323)

In August 2010 Plaintiff reported to Dr. Yoder that she had a trial spine stimulator which helped her leg pain but did not improve her back pain. (Tr. 318) She was further continued on her Coumadin for her ongoing clotting disorder. (Id.) At her appointment in September, 2010 Plaintiff reported doing well on her pain medications of Percocet and not taking more than ninety pills per month. (Tr. 317) She also requested that Dr. Yoder take over her pain medications at this time. (Id.) In November 2010, Plaintiff was complaining of fatigue and the Morton's neuroma on her foot. (Tr. 316) At her appointment in December 2010 she came in for a refill of her pain medications for her back pain and reported she was scheduled for a surgery to remove the

Morton's neuroma on her left foot. (Id.) She had recently had the right foot done. (Id.)

In April, 2009 Plaintiff presented to Dr. Jeffrey Biever for ongoing severe right foot pain. (Tr. 343) She had previous problems in the left and had done well with injections. (Tr. 345) An injection in her right foot was given. (Id.) In August 2009 Dr. Jeffrey Biever surgically removed a Morton's neuroma from Plaintiff's left second interspace as conservative treatment failed to control her symptoms. (Tr. 351-52)

At Plaintiff's March 2010 visit to Dr. Biever, she complained of increasing pain in her left foot. (Tr. 362-63) There was severe tenderness and swelling so he gave her an injection in her left foot. (Id.) In August 6, 2010, Plaintiff presented to Dr. Jeffrey Biever, for follow up on her right foot pain after her recent injection for Morton's neuroma. (Tr. 364) Exam showed swelling and tenderness in peroneal sheath, mild to moderate in fifth metatarsal base and moderate in the third web space as well as effusion in her ankle. (Id.) There was pain with range of motion in her right foot and some residual tenderness and swelling in her left foot. (Tr. 365) She had hypoesthesia in her right foot. (Id.) Dr. Biever did not feel the pain was severe enough at this time to warrant another injection so, instead, he taped Plaintiff's foot. (Id.) In November 2010 Plaintiff returned to see Dr. Biever. (Tr. 375) She had a prior injection but was having increasing pain and difficulty with walking and wanted to explore surgery. (Id.) Dr. Biever found swelling and tenderness on exam in her right foot and ankle. (Tr. 376) He agreed that surgery was an option. (Id.)

At Plaintiff's follow up appointment on December 14, 2010, prior to surgery on her right foot, Plaintiff was complaining of shooting pain and numbness in her left foot. (Tr. 374) Dr. Biever examined her left foot and determined she was having some nerve irritation due to scar

tissue and gave her an injection in her left foot. (Id.)

On December 20, 2010 Dr. Biever surgically removed a right second interspace Morton's neuroma due to the failure to adequately control symptoms with conservative treatment. (Tr. 349-50)

At Plaintiff's post op visit on December 30, 2010, just ten days after her surgery, her right foot was doing well post-surgery. (370-71) Her plans were to return to work on Monday. (Id.) At Plaintiff's visit in February 2011, she was having ongoing difficulties with her left foot, although her right foot had improved. (Tr. 367) Upon exam Dr. Biever noted tenderness was severe in her left second web space. (Tr. 368) Dr. Biever felt she may be suffering from stump neuroma in the left foot and may require another surgery. (Id.) He felt that it could also be scar tissue and if that was the case, she would have to live with the pain. (Id.)

Plaintiff followed up in May 2011 and was still having severe pain in both her feet. (Tr. 392) Dr. Biever examined her and found a new Morton's neuroma on the third web space bilaterally, left worse than right. (Tr. 393) He suggested two more surgeries, left first due to the fact her pain was worse in that foot. (Id.)

On June 6, 2011 Dr. Biever authored a report to Attorney Robert Rosenfeld opining that he had treated Plaintiff for her Morton's neuroma since September 2008. (Tr. 396-97) He had treated her with medication, injections and surgery but she remained symptomatic. (Id.) He opined he believed her symptoms would remain for at least one year and prevented her from ambulating effectively (Id.) He further opined she may need an assistive device to ambulate in the future and at best she would be able to do a sit down job, but that too would limit her walking to

getting to her desk and leaving at the end of the day. (Id.) He felt her condition met the Social Security regulations for disability. (Id.)

Plaintiff presented to Dr. Robert Lee to establish care in June 2012. She presented with a history of deep vein thrombosis for which she is on life-long Coumadin, chronic edema in her hands and feet, chronic pain syndrome in her back and feet and an anxiety disorder for which she is on Wellbutrin. (Tr. 426-430) Dr. Lee examined Plaintiff and noted she had back pain, muscle weakness, numbness in her extremities, left sided facial swelling, no visible swelling in hands. (Id.) There was a history of carpal tunnel release in 1993 and 1994, discectomy in 2004, Morton's neuroma 2009, 2011 and elbow repair in 2012. (Id.)

Plaintiff followed up in July and after medication changes swelling was improved. (Tr. 423) She was also placed on Klonopin for her anxiety and taken off the Wellbutrin as she was not having depressive symptoms. (Tr. 424)

Plaintiff was also seen by Dr. Joan Szynal, M.D. An EMG was performed on September 25, 2012 due to significant medial elbow pain. (Tr. 438-441) The EMG showed some slowing of the right median motor response which may be a sequella of previous surgeries and the results do not appear to be suggestive of ulnar neuropathy nor cervical radiculopathy. (Id.)

Plaintiff presented to Dr. John Schramm, an orthopedic surgeon for ongoing severe right elbow pain in November 2011. (Tr. 461-63) She reported an injury approximately three years ago while at work which has gotten worse. (Id.) Plaintiff complains the pain is a ten out of ten at the worst, and a five to six out of ten at the best. (Id.) It is throbbing and constant in nature and is aggravated by use. (Id.) She was diagnosed with epicondylitis and given a splint. (Id.) She

followed up with Dr. Schramm and was treated with pain medication and injections in an attempt to alleviate her chronic pain but to no avail. In March 2012 Dr. Schramm performed a right epicondylar debridement. (Tr. 450-51) However, months after the surgery her pain is worse instead of better. (Tr. 444) She had a positive Tinel's test, positive elbow flexion test and had lost sensation in her hand. (Tr. 446) She was having decreased sensation on her dorsal hand and Dr. Schramm sent her for an EMG. (Tr. 443)

At the request of the Disability Determination Bureau, Plaintiff presented for a disability exam in March 2011. (Tr. 378-79) Dr. Verlin Houck found Plaintiff had 3/5 strength in her lower extremities and could not move several of her toes at all. (Id.) Dr. Houck also found she had no sensation in the bottom of her feet. (Id.) Plaintiff could not walk on her toes and was wobbly on her heels. (Id.) Plaintiff had a positive straight leg raise test at thirty degrees. (Id.) Dr. Houck further opined that she could stand two out of eight hours and carry less than ten pounds frequently, over ten occasionally, but that she would need to change positions from sitting to standing frequently. (Id.) He opined that she could sit for less than an hour at a time before she needs to stand, move or stretch. (Id.)

On March 11, 2011, Dr. J. V. Corcoran, a non-examining state physician, determined that Plaintiff could perform a sedentary position. (Tr. 384-391) On January 8, 2011, Dr. Fernando Montoya made similar findings.

On March 21, 2011, Dr. Craig A. Nordstrom, Ph.D., examined Plaintiff at the request of the Disability Determination Bureau. He determined that Plaintiff suffers from mild to moderate anxiety with a history of generalized anxiety and poor concentration. (Tr. 380-82) On June 2,

2011, Dr. J. Gange, Ph.D. confirmed Dr. Nordstrom's findings.

In support of remand or reversal of the ALJ's decision, the plaintiff first argues that the ALJ's reasons for not giving controlling weight to Plaintiff's treating physicians are not supported by substantial evidence.

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). *See also* 20 CFR §§ 404.1527(d)(2), 216.927(d)(2); Social Security Ruling 96-2p. Plaintiff contends the ALJ failed to discuss what, if any, weight he gave to the opinion of Dr. Henry DeLeeuw, Plaintiff's treating orthopedic surgeon, and erroneously only gave some weight to the opinion of Dr. Jeffrey Biever, her treating podiatrist, without expanding on the reasons to that weight.

An ALJ must address important evidence in the records. *Martinez v. Astrue*, 630 F.3d 693, 687 (7th Cir. 2011). In the present case, the ALJ stated he only gave some weight to the opinion of Dr. Biever because Plaintiff had not been prescribed an assistive devise and that there was evidence in the record in some visits that she walked with a normal gait. (Tr. 60) Plaintiff argues that the ALJ had a duty to contact Dr. Biever to clarify any ambiguities he found regarding Dr. Biever's opinion on Plaintiff's limitations and the failure to prescribe an assistive device under 20 C.F.R. § 404.1512(e). Plaintiff opines that a simple interrogatory to Dr. Biever to ask why she was not prescribed an assistive device could have clarified that matter and alleviated any confusion regarding her condition and the need for one.

Plaintiff further argues that Dr. Biever's records reflect that Plaintiff had ongoing

problems with the neuromas in her bilateral feet and several surgeries in an attempt to rid her of those neuromas but they kept growing back. Plaintiff had her first surgical removal of the neuroma in August 2009. (Tr. 351-52) At her follow up in October, she was still wearing supportive foot gear and icing her foot. (Tr. 354) She was also complaining of pain in her right foot and was given an injection. (Id.) In March 2010, because Plaintiff's left foot was getting worse and Dr. Biever found swelling and tenderness in her foot, surgery was recommended. (Tr. 363) Plaintiff informed Dr. Biever she was to have back surgery so she would wait until after that surgery to address her left foot. (Id.) Dr. Biever gave Plaintiff another injection, told her to ice her foot and follow up. (Id.)

Plaintiff followed up in August 2010 with increasing pain, her foot was taped and she was told to continue with her shoe inserts. (Tr. 365) In addition, Plaintiff was having peroneal tendinitis in her right foot with swelling along the fifth metatarsal. (Id.) At her next appointment, Plaintiff complained of shooting pain and numbness in her left foot and Dr. Biever opined that she was most likely experiencing irritation from scar tissue. (Tr. 374) He injected her foot and scheduled her for surgery on the right. (Id.) She then had surgery in December 2010 to remove her right neuroma. (Tr. 349-50) Plaintiff followed up with Dr. Biever in February 2011 after the surgery to remove the right neuroma and reported that her left foot was in severe pain. (Tr. 368) At that appointment she was wearing supportive shoe gear on her right foot and still following the RICE, (rest and ice) post-surgical instructions. (Id) Plaintiff had been experiencing ongoing severe bilateral foot pain at this time for over a year and a half including two surgeries and multiple injections. She had been placed off work several times for the procedures and recovery

and still experienced severe pain. At her follow up in May 2011, on exam, Plaintiff had tenderness and swelling in her right foot and tenderness in her left, as well as paresthesia. (Tr. 392) Most importantly, Plaintiff had a new neuroma in the third web space bilaterally. (Tr. 393) Dr. Biever recommended two more surgeries to remove them. (Id.) Plaintiff saw Dr. Biever in June of 2011 and at that appointment she reported the pain was so severe it was waking her up in the middle of the night. (Tr. 400) Dr. Biever recommended another surgery on her left foot to remove the neuroma. (Id.) Dr. Biever wrote a report in June 2011 opining that Plaintiff did not have the ability to ambulate effectively due to the nerve pain between her second and third interspaces of both feet despite ongoing medication and surgical treatment. (Tr. 396) He further opined that there was no shoe gear he could recommend that would improve her problem. (Tr. 397) He also opined that he felt her bilateral foot condition met the Social Security regulations for disability. (Id.)

Plaintiff maintains that all of Dr. Biever's records as described above are consistent with his final determination that she has severe bilateral foot pain that would prevent her from effective ambulation and limit her ability to even walk and stand two out of eight hours in the day. There were objective medical findings of Morton's neuromas that grew back and continued to cause her pain and discomfort preventing her from walking more than thirty minutes at a time.

Furthermore, Plaintiff had supportive findings at her disability examination showing she had no feeling on the bottom of her bilateral feet and was unable to toe walk and was wobbly when she did the heel walk due to her Morton's neuroma. (Tr. 378-79) In fact, Dr. Houck opined she could only do sedentary work. (Id.) Plaintiff testified that Dr. Biever took her off of work in

February 2011 due to her recurring bilateral neuromas and an inability to effective manage them with pain medication, injections and surgery. (Tr. 13) Plaintiff also testified that due to her back pain, she must get up and walk around to relieve that pain, and standing in one place is the most painful. (Tr. 15) She testified she must change positions every thirty minutes because of foot pain and back pain. (Id.) Plaintiff further testified that just getting out of bed to use the bathroom is painful to her feet. (Tr. 16) She further testified that she can only do light housework at home, like dusting, dishes and maybe a load of laundry a day, although she does not carry the laundry basket. (Tr. 17) For all these reasons, Plaintiff argues that the ALJ's finding that Dr. Biever's opinion only be accorded little weight is not supported by substantial evidence.

Plaintiff also argues that the ALJ never discussed Dr. DeLeeuw's opinion that Plaintiff could only do a sit down job for one to two hour increments and must be allowed to get up and move around. (Tr. 409) The VE testified that if Plaintiff had to leave her work station every time she needed to alternate positions, full time competitive work would be precluded. (Tr. 42) Plaintiff contends that Dr. DeLeeuw's records and opinion were critical in determining if her residual functional capacity would allow her to perform sedentary work. The ALJ opined that Dr. DeLeeuw's records, which showed worsening of her condition, were not entirely consistent with a disability. (Tr. 58) Plaintiff had been treating with Dr. DeLeeuw for her back pain for many years. The records in this case from Dr. DeLeeuw begin in November 2009 although Plaintiff's discectomy was in 2004. In November 2009 Plaintiff was complaining of pain at a level of ten out of ten with radiation into her left leg. (Tr. 295) Dr. DeLeeuw felt Plaintiff had a herniated disc at L3-L4 given her symptoms, as well as ongoing degenerative disc disease from L1 through S1.

(Id.) He suggested conservative therapy with a steroid injection, (Id.) Despite the injection (Tr. 281-82), Plaintiff's pain remained severe and at her January 2010 appointment Dr. DeLeeuw noted an antalgic gait and a positive straight leg raising test on the left. (Tr. 293) He ordered an MRI which showed post-operative changes at L4-L5 and a mass effect in the left lateral recess and left neural foramen due to facet ligamentous hypertrophy. (Tr. 298) At Plaintiff's follow up appointment after her MRI, Dr. DeLeeuw recommended a fusion to relieve her leg pain but told her it would not improve her low back pain. (Tr. 291-92) Plaintiff argues that this opinion is critical in assessing Plaintiff's residual functional capacity. Plaintiff notes that the ALJ never mentions the doctor's recommendation in his opinion. Plaintiff claims that the fact that surgery was recommended means that Plaintiff's condition was severe and that the mass mentioned on the MRI was impinging significantly on the nerve root causing her leg pain. Plaintiff did not have the surgery because after her discogram Dr. DeLeeuw opined that he would need to fuse four levels and did not feel that was in her best interest. (Tr. 286) He suggested a spinal stimulator, however it was not successful in reducing her pain so she did not have the permanent implant. (Tr. 408-409) He had no further treatment to suggest so she was referred to Dr. Drew for pain control. Plaintiff points out that the ALJ never discussed the fact that surgery was recommended but then advised against and that a stimulator was not successful. The Seventh Circuit, in *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), opined that they "cannot uphold an administrative decision that fails to mention highly pertinent evidence...".

Plaintiff points out that Dr. DeLeeuw's records indicated complaints of ongoing severe pain which were supported by objective medical evidence. In addition, Plaintiff testified that she

was having ongoing low back pain so severe that she would start her day sitting on a heating pad. (Tr. 19) Plaintiff further testified that she uses two Lidoderm patches on her back each morning to help with the pain and sits on her heating pad. (Tr. 23) She testified that she falls frequently and will not shower unless her sister is at home. (Tr. 20) She further testified she must sit to get dressed due to her balance issues. (Id.) Plaintiff testified that she must change from sitting to walking every thirty minutes due to her chronic back and foot pain. (Tr. 15) Plaintiff argues that this testimony is all consistent with Dr. DeLeeuw's medical records and reports.

Plaintiff further points out that the MRI taken in February of 2012 showed her condition had worsened. (Tr. 410-11) She had increasing stenosis at all levels, she had a disc bulge and scar tissue into the inferior recesses at L4-L5, there was an annular tear or fissure at L-L3, a diffuse annular disc bulge at L3-L4. The disc bulge contacted the L4 nerve root and caused moderate narrowing at the exiting nerve root. (Id.) Plaintiff argues that by ignoring Dr. DeLeeuw's medical opinion, which is consistent with the records and Plaintiff's testimony, the ALJ is attempting to play doctor by making his own medical determination, stating that her low back pain was adequately controlled and since no surgery was recommended it was not as severe as described, when no medical expert has offered evidence to that effect. *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565 570 (7th Cir. 2003). Plaintiff concludes that the failure to consider Dr. DeLeeuw's evidence causes the ALJ's decision to be erroneous.

In response, the Commissioner had not indicated any inconsistency in Dr. Biever's records. Thus, the ALJ's finding that Dr. Biever's records were inconsistent is not supported by substantial evidence, and it appears he should have given Dr. Biever's opinions controlling

weight. Remand is appropriate on this basis.

With respect to Dr. DeLeeuw's opinion, the Commissioner argues that the failure to discuss this opinion was harmless error because even in a sedentary job where Plaintiff was limited to two hours of standing and walking, there are a substantial number of jobs the Plaintiff could perform. However, as Plaintif points out, Dr. DeLeeuw's restrictions included the need to get up and move around every one to two hours. Plaintiff testified at the hearing that standing in one place makes her pain much worse, so she must walk around when she gets up. Plaintiff argues that the RFC limitation of need to alternate between standing and sitting does not include all the limitations opined by Dr. DeLeeuw. Plaintiff further points out that the hypothetical given to the VE did not include the need to leave the workstation, which would occur if Plaintiff is walking as opined by her treating specialists. When the hypothetical to the VE included the impact of leaving the workstation, the VE testified that there would not be any work Plaintiff could sustain. Thus, Plaintiff argues that if Dr. DeLeeuw's opinion had been considered, Plaintiff would have been determined disabled. Clearly, the ALJ should have considered and discussed Dr. DeLeeuw's findings and opinion. Thus, remand is necessary on this basis also.

Plaintiff next argues that the ALJ's credibility determination is not supported by substantial evidence. The ALJ determined Plaintiff was only partially credible with regard to her complaints of severe pain and limitations. The ALJ must follow a two-step process in determining credibility: first determine if there is an underlying medically determinable impairment that could reasonably be expected to produce the pain and symptoms; and second, if the determination is made, evaluate the intensity, persistence and limiting effect of the

individual's symptoms and how they limit the individual's ability to do basic work activities. Social Security Ruling 96-7p, *Scheck v. Barnhart*, 357 F.3d 607, 702 (7th Cir. 2004) Furthermore, the ALJ cannot reject a claimant's statement regarding her symptoms merely because they are not supported by objective medical evidence but must review the entire record to determine credibility. *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004)

In the present case, Plaintiff's records are supportive of her claims that her condition is so severe she must use narcotic medication, a hot pad, analgesic pads and change positions every thirty minutes in order to get through a day even when she is not doing anything to physically exert herself, much less working eight hours per day five days per week.. The ALJ opines that Plaintiff returned to work after her 2004 discectomy and has not had surgery on her back since 2004. (Tr. 58) Plaintiff contends the ALJ ignores the records which support the fact that Plaintiff has been told not to have the surgery despite needing to because it would require a four level fusion. (Tr. 286) Plaintiff argues that Dr. DeLeeuw's records and opinion are consistent with Plaintiff's complaints of ongoing pain and discomfort without any further medical interventions to offer her to improve her pain. The ALJ also opined that because Plaintiff had some visits when her straight leg raise test was negative, and sometimes she didn't have an antalgic gait, she must not have severe pain. Plaintiff points out that the positive straight leg raise test is just one of a number of diagnostic tests to determine if there is a herniated disc. Approximately sixty percent of patients who show a herniated disc on MRI have a positive straight leg raise test. Therefore, Plaintiff argues that the fact she does not test positive at every exam has no real validity with regard to her complaints of pain and her back condition. Plaintiff reiterates that the MRI in 2012

showed the bulging discs, mass effect at L4-L4, disc herniations and worsening spinal stenosis from levels L1 through S1; in other words her entire lumbar spine. (Tr. 410-411) In fact, this MRI was taken a year after Dr. DeLeeuw opined she needed surgery.

The ALJ further opines that Plaintiff stated she had no problems with personal care; can prepare a simple meal, dust, do laundry, drive a car, go out three times per week and shop in stores. Plaintiff argues that the ALJ misstates her testimony with regard to her abilities. She testified that she cannot take a shower without her sister there because she falls and has difficulty getting dressed due to her balance problems. (Tr. 20) She testified she can only drive until a couple hours after her pain medication wears off because it makes her groggy and fuzzy. (Tr. 16) She further testified she can only do one load of laundry and her sister must carry the basket. (Tr. 17) She testified she does not cook; she eats cereal or makes a sandwich if she is hungry. (Tr. 18) She does not do yard work although on occasion she can sit in the garden and pull a few weeds. (Id.) In addition, at the hearing Plaintiff testified she sometimes visits her mother and aunt who live just a few minutes away but really doesn't go anywhere else. (Tr. 19) She does run down to the grocery for a few minutes to get what she needs. (Tr. 26) Plaintiff further testified that due to the side effects of her medication, she takes one to two naps per day anywhere from thirty minutes to an hour. (Tr. 35) Plaintiff cites to *Carradine*, 360 F.3d at 756, wherein the Seventh Circuit held that the ability to walk, drive, shop and do housework on occasion is insufficient to support a finding that a plaintiff can work eight hours a day, five days per week.

Plaintiff further points out that a precise cause of pain does not need to be made to determine that pain can be severe and disabling and lack of a precise cause does not mean that

Plaintiff is faking her symptoms or exaggerating them. *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

Plaintiff concludes that the records are consistent with Plaintiff's complaints of chronic ongoing pain. She is on Percocet, Zanaflex, Lidoderm patches, Celebrex and Grasile for her chronic ongoing pain. Dr. Biever has suggested additional surgeries to remove the recurring neuromas which cause severe pain and Dr. DeLeeuw has suggested although her condition is severe enough to warrant a fusion, he would not recommend the surgery because it would entail four levels. Plaintiff notes that she has been compliant with treatment and medication as suggested by her physicians, yet remains in chronic severe pain.

In response, the Commissioner argues that the ALJ based his credibility determination on Plaintiff's "Function Report" and not on the testimony at her hearing. Plaintiff, in reply, notes that if this is correct, the ALJ committed reversible error by not taking into consideration Plaintiff's testimony. In determining credibility, the ALJ must consider all the factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) in evaluating Plaintiff's subjective complaints, including Plaintiff's testimony. Plaintiff also points out that the ALJ's summary of the Function Report is misstated. Plaintiff again explains that she does not prepare simple meals. Rather, she cuts up fruit or makes a sandwich or uses the microwave to cook frozen foods. With regard to her personal care, plaintiff reported she must take a bath rather than a shower due to instability, contrary to the ALJ's statement that Plaintiff has no difficulty with self-care. Plaintiff reported that she goes outside about three times per week, not that she goes out three times per week, as inferred in the ALJ's decision. Plaintiff also reported she can only go for short periods and cannot drive due to pain in her legs. Plaintiff further reported she shops for food twice per month and never for more than one hour.

Plaintiff testified that she does laundry, but she cannot carry the basket up and down stairs.  Rather, she does small pieces at a time.  Plaintiff further reported both in her Function Report and in her testimony that she naps a couple hours per day due to her medications.  On the basis of the foregoing, this court finds that the ALJ's credibility determination is unsupported.  Thus, Plaintiff's credibility must be reconsidered on remand.

With respect to the ALJ's RFC determination, Plaintiff again reiterates that her treating physicians, Dr. Biever and Dr. DeLeeuw, both opine she would need to sit for six out of eight hours and stand for two hours out of an eight hour day, with the need to alternate sit/stand with the ability to walk around when she stands.   The consulting physician, Dr. Verlin Houck, also opined that Plaintiff would require a position that she could sit six out of eight hours and walk two hours and would need to frequently change positions while being allowed to walk.  Further, the RFC form completed by Dr. Corcoran indicates she can stand and walk two hours out of an eight hour day and sit for six hours out of an eight hour day.  The Plaintiff agrees that the ALJ may discount opinions of treating or examining physicians if there is other evidence that contradicts those records.  However, the Plaintiff correctly argues that the Commissioner fails to point to any evidence that would support the RFC found by the ALJ.  Clearly, the RFC is unsupported by substantial evidence and a remand is required on this basis also.

## Conclusion

On the basis of the foregoing, this matter is REMANDED to the Commissioner for further proceedings consistent with this opinion.

Entered: December 29, 2014.

s/ William C.  Lee
William C. Lee, Judge
United States District Court